IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JEFFREY STEVEN AKRIGHT,

                         Plaintiff,                    OPINION and  ORDER

              v.                                       09-cv-648-bbc

RANDELL HEPP and APRIL FUMOY,
sued in their individual and official capacities,[1]

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Jeffrey Steven Akright believes that he and other prisoners in Wisconsin are

being overcharged at prison canteens around the state because officials are marking up prices

well above the 10 percent permitted by prison policy.  Plaintiff wanted to obtain documents

to prove his theory, but he was constrained by Wisconsin's open records law, which does not

apply to requests by prisoners unless they are asking for records about themselves.  Wis. Stat.

§ 19.32(3).  Plaintiff attempted to solve this problem by asking his grandmother to submit

---

[1]   In his complaint, plaintiff identified April Fumoy as "C.O. Fumoy."   I have
amended the caption to reflect this defendant's full name as identified in defendants'
summary judgment materials.

1

a request for him.  She complied and forwarded the documents she received to plaintiff, including price lists, invoices and policies related to the canteen.  However, the documents never reached him because defendant April Fumoy, a correctional officer, intercepted them in the mail room.  Plaintiff later received a conduct report for possessing contraband, which was upheld by defendant Randall Hepp, the warden.  In this lawsuit brought under 42 U.S.C. § 1983, plaintiff contends that defendants' actions violated his rights under the First Amendment.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

Defendants have filed a motion for summary judgment, which is ready for decision. Because I conclude that defendants' actions are reasonably related to their interests in reducing administrative burdens and preventing prisoners from obtaining information that undermines prison security, the motion will be granted.

From the parties' proposed findings of fact and the record, I find that the following facts are undisputed.

UNDISPUTED FACTS

A.  <u>Open Records Requests</u>

Plaintiff Jeffrey Steven Akright is incarcerated at the Jackson Correctional Institution. In 2006, while he was still housed at the Stanley Correctional Institution, he suspected that prison officials were marking up prices for items sold to prisoners in the canteen more than

2

the 10 percent that is suggested under prison policy.  He asked his grandmother to submit multiple requests under Wisconsin's open records law to the prison to help him determine whether his suspicions were correct.  Among the records plaintiff's grandmother obtained and sent to plaintiff was a "stock detail report" showing that the prison paid $.35 for a hair pick, but prisoners were charged $2.32 for it.

Plaintiff showed the report to his unit manager, who contacted the official who ran the canteen to discuss the price difference.  The unit manager did not suggest to plaintiff that his possession of the report raised a security concern.   Plaintiff filed a grievance about the price of the hair pick as well as dozens of other items that he believed were being marked up more than 10 percent.  (The vast majority of the alleged overcharges were one or two cents.) Plaintiff's grievance was denied on the ground that he was relying on inaccurate information and that "[a]ll items are marked up cost plus 10%."  Plaintiff appealed the decision to the Secretary of the Wisconsin Department of Corrections, attaching a purchase invoice and an administrative directive that his grandmother had sent him.  Although the Secretary denied plaintiff's appeal, he did not say in his decision that the attached documents presented a security concern.

In January 2009, after plaintiff was transferred to the Jackson Correctional Institution, plaintiff's grandmother sent an open records request to the business office at the Jackson prison. The request was granted in part and prison staff sent plaintiff's grandmother

3

the most current "Canteen Price List Document," "Stock Detail Reports," purchase invoices and "Administrative Directives" 24.1, 24.2 and 24.3.  The following instruction accompanied the documents: "This record should not be further distributed to any inmate in any state correctional facility by you or anyone else because this is considered contraband by the Wisconsin Department of Corrections and subject to criminal charges."

The stock detail reports list various items sold at the canteen, along with an "item code," the "average cost" and the "selling price" for each item.  The administrative directives provide general rules regarding the operation of the canteens.  The information on the invoices varied but some items included were the name, address and telephone number of the vendor, the invoice number, the quantity and price of products ordered, the date of the order and the account number.

## B.  <u>Conduct Report</u>

On June 11, 2009, defendant April Fumoy, a correctional officer at the Jackson prison, was working in the mail room.  When Fumoy inspected a package that plaintiff's grandmother had sent him, she discovered the documents from the January 2009 open records request.   Fumoy sent plaintiff a form notifying him that he would not receive the package because it contained contraband and "concerned an activity, which if completed would violate the laws of Wisconsin, the United States or the Administrative Rules of the

4

Department of Corrections."

On June 12, the financial records supervisor for the Jackson prison issued a conduct report to plaintiff for possession of contraband. According to the report, prison staff had recorded telephone conversations in which plaintiff had asked his grandmother to submit the open records request on his behalf and then send him any documents generated by the request. After a hearing, the adjustment committee found plaintiff guilty and imposed a sentence of 120 days of disciplinary separation. Defendant Randell Hepp, the warden, affirmed the committee's decision.

## C.  Instances of Prisoner Fraud

In the past, prisoners have used vendor information to bring contraband into Wisconsin prisons. For example, prisoners at the Green Bay Correctional Institution used vendor names to receive felt markers with drugs concealed inside. Also at Green Bay, prisoners received four $100 bills hidden inside a bag of hobby beads using the name of an approved vendor. At the Oshkosh Correctional Institution, prisoners used a vendor's name as the return address of a radio that had been disassembled and filled with tobacco. At the Waupun Correctional Institution, prisoners used a vendor's return address in an attempt to smuggle into the prison a bottle that was labeled prayer oil but was actually cologne.

5

### D.  Other Instances in Which Prisoners Obtained Vendor Information

On February 25, 2010, another prisoner at the Jackson prison received through the mail eight pages of the canteen supply order form.  The same day, plaintiff received through the mail 21 canteen purchase invoices.

In the course of discovery in this case, defendants produced to plaintiff the Stanley prison's canteen price list, stock detail report and purchase invoice for summer sausage.  The account number and vendor name were not redacted.  They also produced Administrative Directive 24.1, 24.2 and 24.3.  These policies are no longer in effect and do not create a security concern "on [their] face."

### E.  Limitations on Communication with Vendors

In 2007, the Wisconsin Department of Corrections changed its policy regarding prisoner vendor orders.  Under the new policy, prisoners buy property from outside the prison through a "Canteen Catalog Program."  All the items in the catalogs come from one of several preapproved vendors: J.L. Marcus, Union Supply, Access Catalog and Walkenhorst's.

It is the policy of the Wisconsin Department of Corrections to require prisoners to send all outgoing mail unsealed so that it may be inspected. Plaintiff does not have access to the internet at the Jackson prison.  When he makes a telephone call, the recipient is

6

informed that "the call is from a correctional institution." All his outgoing mail is stamped with the message, "this letter has been mailed from the Wisconsin Prison system."

### E.  Prisoners' Alternatives to Submitting an Open Records Request

Various policies related to the canteen are available for review in the library by any prisoner.  Administrative Directives are not generally available to Jackson prisoners, but if a prisoner wanted to see a directive, he could submit a request to the librarian, who would then determine whether it was appropriate for the prisoner to view the directive.  More generally, prisoners who have questions or want information may submit an "Interview/Information Request."  The inmate handbook instructs prisoners to submit a request to the storekeeper, the financial programs supervisor or the corrections management services director if they have questions about the canteen.

### OPINION

### A.  Legitimate Interests

There is no dispute that prisoners have a right under the First Amendment to receive mail.  Thornburgh v. Abbott, 490 U.S. 401 (1989); Rowe v. Shake, 196 F.3d 778, 782 (7th Cir. 1999).  Generally, when a prison restriction implicates a prisoner's First Amendment rights, the question is whether the restriction at issue is reasonably related to a legitimate

7

penological interest under the test set forth in Turner v. Safley, 478 U.S. 82 (1987).  The first factor courts must consider is whether a "valid, rational connection" exists between the regulation and the legitimate interest put forth to justify it.  Id. at 89.

The Supreme Court has given somewhat mixed signals regarding which party has the burden on the first factor.  Compare  Beard v. Banks, 548 U.S. 521 (2006) ("Turner requires prison authorities to show more than a formalistic logical connection between a regulation and a penological objective."), with Overton v. Bazzetta, 539 U.S. 126, 132 (2003) ("The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it.")  However, this court and the Court of Appeals for the Seventh Circuit have held consistently that prison officials have the initial burden to demonstrate the validity of any decision to limit a prisoner's ability to receive or communicate information.  King v. Federal Bureau of Prisons, 415 F.3d 634, 639 (7th Cir. 2005) ("[T]he government must present some evidence to show that the restriction is justified"); Conyers v. Abitz, 416 F.3d 580, 585 (7th Cir. 2005) (imposing burden on prison officials under Turner to show that interest was implicated in particular case); Johnson v. Raemisch, 557 F. Supp. 2d 964, 972 (W.D. Wis. 2008); Kaufman v. Schneiter, 524 F. Supp. 2d 1101, 1109 (W.D. Wis. 2007).

I agree with plaintiff that the officials who wrote his conduct report, found him guilty and rejected his grievance had a difficult time generating a coherent rationale for censoring

the documents his grandmother sent.  Plaintiff was disciplined under Wis. Admin. Code §
DOC 303.47(2)(a), which prohibits prisoners from possessing "[i]tems of a type which are
not allowed."   The rule itself provides only a circular justification for the conduct report:
the documents were contraband because plaintiff was not allowed to have them.  The rule
does not identify *why* the documents are prohibited.

The officials involved in disciplining plaintiff did not improve much on the tautology
of the rule.  The conduct report says that plaintiff "is in violation of 303.47" because he
"attempt[ed] to have delivered items of contraband into Jackson Correctional Institution."
Hepp Aff., exh.101, dkt #15-3, at 1-2.  The adjustment committee's report says that plaintiff
"knew he was not allowed to have" the documents because his grandmother repeated
information in the letter from Jackson staff that she was not supposed to give him the
documents.  Id. at 11-14.  This may show that plaintiff violated instructions willfully, but
it still does not show the reason for the prohibition.  The committee hinted at a justification
when it wrote that plaintiff "attempted to circumvent the rules and used a member of the
public to attempt to receive items that he knew he would not be allowed to have."   Id. at
14.  Finally, the complaint examiner said that the package "contains documents inmates are
not permitted to have in their possession." Hepp Aff., exh. 101, dkt. #15-4, at 30. Although
the examiner cited rules regarding security, she did not explain how the documents violated
those rules.

Defendants do a better job in their briefs and proposed findings of fact. They identify two reasons for prohibiting the documents: (1) prisoners could use information from the documents, such as vendor names and account numbers, to smuggle contraband, make fraudulent charges and create false documents; (2) allowing plaintiff to possess the documents would undermine the Wisconsin open records law, which does not allow prisoners to request a document unless it relates to that prisoner. These justifications were not articulated clearly until after plaintiff filed this lawsuit, but that does not seem to be a problem under the law of this circuit. In Hammer v. Ashcroft, 570 F.3d 798, 803 (7th Cir. 2009), the court stated that a prisoner official's actual reasons for taking a particular action are irrelevant under Turner. Rather, Tuner requires "an objective inquiry": "whether a rule is rationally related to a legitimate goal." Id. Under Hammer, it makes little difference when officials identify a legitimate penological interest for a restriction so long as there is a reasonable nexus between the interest and the restriction. But see Salahuddin v. Goord, 467 F.3d 263, 276-77 (2d Cir. 2006) ("[P]rison officials must show that the disputed official conduct was *motivated* by a legitimate penological interest.") (emphasis added).

1. Preventing fraud and smuggling of contraband

With respect to the smuggling of contraband, defendants' argument seems to be that prisoners could use the purchase invoices to discover vendor names of which they would

10

otherwise be ignorant and then have accomplices outside the prison send in contraband using the name of that vendor as a return address.  Although the examples defendants cite show that prisoners have used vendor names in the past in attempting to smuggle contraband into the prison, it is not clear how this problem could be addressed by preventing prisoners from seeing invoices.  Under the current vendor policy, it seems that a prisoner's purchase through the mail must come from a preapproved vendor.  The prisoners already know the names of the preapproved vendors because they are printed in a catalog distributed to the prisoners. Under the new policy the prison can reject packages sent to prisoners from different vendors who are not rpeapproved.  It may be that defendants are concerned that prisoners will try to copy the format of the invoices from preapproved vendors, but defendants do not explain how plaintiff or any other Jackson prisoner could obtain access to the tools necessary to make a realistic copy.

Defendants' argument regarding fraud is that prisoners could use information from the invoices such as account numbers and product code numbers to make fraudulent charges. Defendants do not identify any instances in which that has occurred in the past, but that is not necessarily required.  Singer v. Raemisch, 593 F.3d 529 (7th Cir. 2010) (finding is logical connection between restriction on role playing games and interest in suppressing gangs even though defendants failed to point to any instances in which problems had occurred before). Plaintiff's response is that defendants' concerns about fraud are misplaced because he does

not have the means to place orders with vendors, at least not without being identified as a prisoner.  He does not have access to the internet; when he makes a call, the recipient is informed that "the call is from a correctional institution"; and all his outgoing mail is stamped with the message, "this letter has been mailed from the Wisconsin Prison system."

Plaintiff's argument has some force, but it does not necessarily mean that it is irrational for defendants to prevent prisoners from obtaining the prison's invoices.  For one thing, plaintiff's affidavit addresses *his* limitations on communicating with vendors. Although it may be reasonable to infer that all prisoner mail and telephone calls are treated the same way, it is not clear whether other prisoners might have access to the internet and could contact vendors that way.  Second, even if prisoners do not have the ability to submit orders to vendors, that would not prevent prisoners from sending information to nonprisoners for the purpose of submitting a false charge from outside the prison.  To this, plaintiff responds that nonprisoners can get vendor information through their own open records request without the help of the prisoner.  That may be true, but prison officials are not required to make it easier for prisoners to commit fraud simply because there are other ways the prisoner can achieve the same result.

Plaintiff says next that he and other prisoners have been obtaining similar information through open records requests for years, that until now, no one has considered it to be a problem and that even now some of the same information has been allowed in other

12

instances.  Plaintiff seems to be making two arguments: (1) defendants have no legitimate interest in censoring the information because he has never misused it in the past; and (2) past decisions to permit him to keep these documents without consequence show that no legitimate interest is furthered by the censorship.  The first argument is a nonstarter.  Again, the question is not whether problems have occurred in the past, or even whether plaintiff in particular is likely to misuse any information he obtains; it is whether it is rational for officials to believe that *any* prisoner may misuse the information in the future.  Prison officials are not required to create a separate set of rules for plaintiff simply because he represents that he is trustworthy.

Plaintiff's second argument is more substantial.  The court of appeals has suggested in some cases that inconsistent applications of a rule may show that the rule is not a reasonable one.  E.g., George v. Smith, 507 F.3d 605 (7th Cir. 2007) ("A prison could not invoke security as a reason to exclude publications that prisoners may read in the library, and which they may copy out for use in their cells.").  However, in other cases, the court has stated that some inconsistency is permitted.  Mays v. Springborn, 575 F.3d 643, 649 (7th Cir. 2009) ("Mays's only argument that the prison's censorship was unreasonable is that he had access to other writings and to television shows about prison riots, but the deference we afford prisons permits such seeming inconsistences.");  Azeez v. Fairman, 795 F.2d 1296, 1299 (7th Cir. 1986) ("The failure to enforce a rule consistently does not make the rule

13

unconstitutional.").  Further, some of the inconsistency may be more apparent than real because most of the examples plaintiff cites occurred at another prison and involved different prison officials. The documents plaintiff received in discovery relate to his former prison as well.  However, I agree with plaintiff that the large number of exceptions to the rule make it more difficult for defendants to argue that there is a genuine security justification in keeping this information from prisoners.

Even if I assume that a logical connection exists between preventing fraud and keeping prisoners from knowing vendor information, that rationale applies to the purchase invoices only.  Neither the administrative directives nor the stock detail reports include any of the information that defendants say could be misused by prisoners.  The stock detail reports are lists of products and prices and defendants do not identify any security reasons for depriving prisoners of that information.  With respect to the administrative directives, defendants admit that they are no longer in force and do not contain any confidential information. Because plaintiff was disciplined for the stock detail reports and administrative directives as well, it is necessary to consider defendants' second justification.

2.  <u>Open records law</u>

Defendants' second justification has less to do with the content of the documents and more to do with the way plaintiff obtained them.  In particular, defendants argue that their

14

decision to deny delivery of the documents and discipline plaintiff was justified by their "interest in upholding the public policy behind Wisconsin's open records law." Dfts.' Br., dkt. #19, at 7. The general rule under that law is that "any requester has a right to inspect any record." Wis. Stat. § 19.35(1)(a). There are various exceptions to this rule, but only one of them relates to the status of the person making the request. Under Wis. Stat. § 19.32(3), "a committed or incarcerated person" may not make a request under the open records law unless he "requests inspection or copies of a record that contains specific references to that person or his or her minor children for whom he or she has not been denied physical placement under ch. 767, and the record is otherwise accessible to the person by law."

Defendants are careful not to argue that the open records law prohibits what occurred in this case. The statute restricts a prisoner's right to ask for documents from a state agency, but it does not prohibit a nonprisoner from obtaining documents under the open records law and then giving them to a prisoner. Thus, defendants' argument is that plaintiff was attempting to "circumvent" the law by using his grandmother to obtain what he could not obtain himself. Defendants say that "[t]he public policy behind . . . Wis. Stat. § 19.32(3) would be left without any 'oomph' if such a tactic were allowed." Dfts.' Br., dkt. #19, at 7.

At first look, it may seem that defendants are not asserting a *penological* interest because enforcement of Wis. Stat. § 19.32(3) is not tied directly to safety, security or prison

administration.  Why is it defendants' concern to fill a statutory gap that the legislature declined to address? Is this a case in which heightened scrutiny is appropriate because defendants are restricting a right on grounds that stray from the needs of a running a prison? Thornburgh v. Abbott, 490 U.S. 401, 412 (1989) ("Where . . . the nature of the asserted governmental interest is such as to require a lesser degree of case-by-case discretion, a closer fit between the regulation and the purpose it serves may safely be required."). See also West v. Frank, 492 F. Supp. 2d 1040, 1046 (W.D. Wis. 2007) (suggesting that heightened scrutiny may be appropriate in some prisoner cases when interest in safety or security is not implicated).

If plaintiff had tried to obtain documents unrelated to the prison that would not be prepared by prison staff, perhaps defendants' efforts to police Wis. Stat. § 19.32(3) would be overreaching.  However, in this case, plaintiff's attempt to avoid the "prisoner exclusion" of the open records law implicates penological concerns in at least two ways.  First, as defendants point out, at least one purpose of the provision is to avoid burdensome and sometimes frivolous requests for public documents filed by prisoners. James Thomas Snyder, Restricting Prisoners' Freedom of Information, 2000 L. Rev. Mich. St. U. Det. C.L. 765, 778 (2000) (Wisconsin legislators stated that law was needed because prisoner records requests were a "nuisance" and led to "harass[ment of] local officials").  That is also the intent behind at least seven similar laws in other states.  Id. at 786 ("Out of the eight states, the most-cited

16

rationale for the statutory changes is not security or privacy, but rather cost and burden.")
See also Michael W. Field, Rhode Island's Public Access to Records Act, 8 Roger Williams
U. L. Rev. 293, 352 (Spring 2003) (noting large number of prisoner information requests in
various states).  If prisoners are able to avoid the limitations of § 19.32(3) by submitting
their requests through a third party, it increases the administrative burdens on prisons that
the provision was designed to avoid.  Defendants may be overstating their case when they
say that the law "would be left without any 'oomph,'" Dfts.' Br., dkt. #19, at 7, if they
allowed nonprisoners to make open records requests through third parties because the
number of third parties willing to make such requests is likely much smaller than the number
of prisoners who would submit the requests on their own if they could.  However, I cannot
say that "the logical connection between the regulation and the asserted goal is so remote as
to render the policy arbitrary or irrational." Turner, 482 U.S. at 89-90.

A second penological concern relates to oversight of information disseminated about
the prison.  Even if third party requests are few and far between, defendants have a
legitimate interest in requiring prisoners to ask officials directly if they wish to obtain
documents about the prison so that the officials can insure that prisoners do not obtain
documents that might undermine the security of the prison.  Officials may be
understandably concerned if documents about the prison's internal workings are being
exchanged and disseminated throughout the prison without the officials' knowledge.  Even

17

if some documents do not present a threat, it is legitimate and rational to require prisoners to follow a process that keeps officials informed of the documents prisoners are seeking.

Plaintiff's only argument regarding defendants' interest in enforcing the open records law is that the law itself is invalid.  In particular, plaintiff says that the limitation on prisoners  is "overreaching," "flies directly in the face of the" general policy of open government and prevents prisoners from exposing wrongdoing at the prison.  Plt.s' Br., dkt. #20, at 9-10.  Plaintiff raises valid concerns that were shared by some Wisconsin legislators who opposed the law.   Snyder, supra at 779.  However,  the constitutionality of Wis. Stat. § 19.32(3) is not properly before the court.  Plaintiff did not include a claim in his complaint challenging the law and I did not allow him to proceed on such a claim.  Thus, I must assume for the purpose of this opinion that defendants have a valid interest in enforcing the law. City of Cleburne, Texas v. Cleburne Living Center, 473 U.S. 432, 440 (1985) ("The general rule is that legislation is presumed to be valid.")

Even if I could consider the constitutionality of Wis. Stat. § 19.32(3), it is unlikely that plaintiff could prevail on such a claim.  It does not appear that the Wisconsin Supreme Court or the Wisconsin Court of Appeals has considered any challenges to the statute, but courts in other jurisdictions have found similar laws to be valid.  Giarratano v. Johnson, 521 F.3d 298, 304-05 (4th Cir. 2008); Leija v. Koselka, 2007 WL 2950787, *3 (E.D. Mich. 2007); Revere v. Canulette, 715 So. 2d 47, 53 (La. Ct. App. 1998).  Although there may be

18

good arguments for giving prisoners the same access to public records as everyone else, a statute is not unconstitutional simply because some may view it as unwise or representing bad policy choices.  FCC v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) (Constitution "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices").  Rather, statutes that single out prisoners for less favorable treatment comply with the equal protection clause so long as "the legislature could think the rule rationally related to any legitimate goal of government." Johnson v. Daley, 339 F.3d 582, 585-86 (7th Cir. 2003).  In Giarratano, Leija and Revere, the courts held that it is rational to conclude that prisoners are more likely than nonprisoners to file burdensome and frivolous requests for information.  Because the Court of Appeals for the Seventh Circuit has used similar reasoning in upholding limitations on prisoner litigation, e.g., Zehner v. Trigg, 133 F.3d 459, 463 (7th Cir. 1997), it is likely that the court would uphold § 19.32(3) on these grounds as well.

## 2.  Other factors under *Turner*

Plaintiff has the burden on the remaining three factors under Turner.  Singer v. Raemisch, 593 F.3d 529, 536-37 (7th Cir. 2010) ("[T]he burden shift[s] to" prisoner "once the prison officials provid[e] the court with a plausible explanation.").  The second factor is whether plaintiff has adequate alternatives to exercising his rights.  Turner, 478 U.S. at 90.

19

In this case, the rules at issue prohibit plaintiff from seeking information through a particular *method* only; he remains free to ask prison officials for information regarding the amount paid by the prison for items sold in the canteen.  Although plaintiff says that a direct request would not be successful, that argument is speculative because he did not actually ask officials at his prison for any of the information at issue in this case.  In fact, the argument is undermined by plaintiff's own evidence:  an affidavit from another prisoner who avers that he received copies of stock detail reports by asking prison officials for them.  Vollbrecht Decl. ¶ 4, dkt. #24.  Because those reports seem to contain all the information that plaintiff was concerned about, the restriction appears to have little effect on plaintiff's ability to expose any price gouging that might be occurring.

In any event, even if plaintiff would not have been able to find pricing information without initiating an open records request, a prisoner's lack of access to a  small amount of information does not require a conclusion that defendants violated his First Amendment rights so long as "the regulations at issue in the present case permit a broad range of publications to be sent, received, and read." Thornburgh, 490 U.S. at 418.  That standard is met in this case.

The third factor is the effect an accommodation of the asserted right will have on guards, other prisoners and prison resources.  Turner, 478 U.S. at 90.  This factor tends to overlap the first factor.  Plaintiff's only argument regarding the impact on the prison is that

20

he has never given the documents he obtained from past open records requests to other prisoners.  Again, the question is not whether plaintiff individually will abuse the information he has, but whether other allowing all prisoners to obtain the same kind of information could have an adverse "ripple" effect. With respect to the information in the invoices, plaintiff has not shown that prisoners can obtain access to the vendor information without creating a risk of fraud.  With respect to the other documents, plaintiff has not shown that defendants are wrong to believe that prisoners' use of third parties to submit open records requests will lead to undue burdens on prison staff and create a risk that prisoners will obtain documents that undermine prison security.

Finally, the fourth factor is whether plaintiff has identified an "obvious, easy alternative" to the restriction that will not undermine defendants' legitimate interests. Turner, 478 U.S. at 90.  Plaintiff does not point to any ways that defendants could allow plaintiff to keep the documents but still uphold their interests in preventing fraud and enforcing the policy of the open records law.  Accordingly, because each of the factors favors defendants, their motion for summary judgment must be granted.


ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Randall Hepp and April Fumoy, dkt. #13, is GRANTED.  The clerk of court is directed to enter

judgment in favor of defendants and close this case.

Entered this 22d day of October, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge